Filed 6/18/24  P. v. Munsey CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D081269 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE408923) |
| ABATE DOLPHI MUNSEY, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Aaron H. Katz, Judge.  Affirmed.

Justin Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene Sevidal and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Abate Dolphi Munsey guilty of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1) (count 1)); three counts of corporal injury to his spouse, M.M. (Pen. Code, § 273.5, subd. (a) (counts 2, 4, 5); and one count of making a criminal threat to M.M. (Pen. Code, § 422 (count 3)). The jury further found that as to count 1, Munsey personally used a deadly and dangerous weapon (Pen. Code, § 1192.7, subd. (c)(23)); as to counts 1 and 3, that M.M. was a victim of domestic violence (Fam. Code, § 6211; Pen. Code, § 1203.097, subd. (a)); as to counts 1 and 2, that Munsey personally inflicted great bodily injury upon M.M. (Pen. Code, § 12022.7, subd. (e)); and as to counts 2 and 3, that Munsey personally used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)).

Munsey contends on appeal that the trial court prejudicially erred by excluding testimony regarding M.M.'s immigration status, specifically references to her K-1 visa,[2] under Evidence Code section 352. We conclude that the court did not abuse its discretion, and therefore affirm the judgment.

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     During pre-trial proceedings, Munsey's counsel also argued that evidence regarding "U visas" should be admitted. A U visa allows a non-citizen to remain temporarily in the United States based on their status as a victim of certain crimes, including domestic violence, if they assist law enforcement with the investigation or prosecution of the offense. (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1267, fn.1 (*Castaneda-Prado*); *People v. Villa* (2020) 55 Cal.App.5th 1042, 1050 (*Villa*); see 8 U.S.C. § 1101 et seq., as amended by Pub.L. No. 99-603 (Nov. 6, 1986) 100 Stat. 3359; 8 U.S.C. § 1101(a)(15)(U).) On appeal, however, Munsey concedes that the trial court had a valid basis for "exclud[ing] any reference to a U visa" and states that he "does not challenge that ruling on appeal." In any event, we note that Munsey offered no concrete evidence that M.M. ever applied for or considered applying for a U visa—or even knew what one was. Accordingly, we limit our analysis to the issue Munsey has raised regarding M.M.'s K-1 visa.

FACTUAL AND PROCEDURAL BACKGROUND[3]

*A. Domestic Abuse Allegations*

Munsey was born in Ethiopia and moved to the United States (U.S.) at a young age to live with his adoptive parents. In 2018, Munsey went on a church mission trip to Ethiopia where he met M.M. After Munsey left Ethiopia and returned to the U.S., he and M.M. had a long-distance romantic relationship for about two years. During that time Munsey sent money to M.M. and her family in Ethiopia, and they talked frequently about marriage. They got engaged in 2019, M.M. arrived in the U.S. on a K-1 visa in May 2021, and they got married in July 2021.

Around June 2021, Munsey grabbed M.M. and slapped her back and thighs to force her to have anal and vaginal sex with him against her will. Munsey's hands left visible bruises and marks on M.M.'s shoulder, arm, and legs. M.M. recalled that similar incidents happened on multiple occasions.

During an argument in September 2021, Munsey put his hands around M.M.'s neck, making it difficult for her to breathe. Munsey eventually let go of her neck, but his hands left visible marks and she felt discomfort in her neck and throat for a few days afterwards.

One evening in October 2021, Munsey's father and his father's girlfriend, A.L., visited Munsey and M.M.'s apartment to give them marital advice. Shortly before his father and A.L. arrived, Munsey texted M.M., threatening to kill her. At one point in the evening, when A.L. and M.M. were alone in a separate room away from Munsey and his father, M.M. cried and told A.L. that Munsey was controlling.

---

[3]    Because of the limited scope of the issues on appeal, we provide an abbreviated summary of the relevant facts.

3

After his father and A.L. left, Munsey began questioning M.M. about what she told A.L. Unsatisfied with her answers, Munsey took a small knife from the kitchen and threatened to cut her unless she told him "the truth." M.M. went to the bedroom and texted A.L. for help. Munsey came into the bedroom and dragged the knife across M.M.'s shoulder, chest, and neck, threatening to kill her. He then pierced M.M.'s thigh with the knife, leaving a two-inch laceration. She pushed him away, ran from the apartment, and eventually called 911.

*B. Defense Evidence*

Munsey's friends and relatives never saw Munsey behave violently, lose his temper, or act in a controlling manner.

Munsey's father, who provided counseling to M.M. and Munsey over the course of a few weeks, never heard M.M. mention abuse. He observed that she was sometimes "very sad" and "withdrawn" from Munsey. Munsey's sister also observed that M.M. was "quiet," seemed unhappy, and did not interact much with Munsey's family members during gatherings. M.M. never mentioned abuse to Munsey's sister.

An emergency room physician, testifying as an expert witness, reviewed police reports and photographs of M.M.'s injuries from October 2021. He opined that abrasions on her upper body and the cut on her thigh could have been self-inflicted, but he also could not rule out assault. The thigh injury was in a location "convenient" for self-infliction.

Munsey testified in his own defense and denied ever being violent or aggressive towards M.M. When asked about M.M.'s abuse allegations and photographs of her injuries, Munsey said that any injuries must have been self-inflicted, including the knife wound. While their relationship was smooth at first and Munsey provided for M.M. financially, they began

4

arguing more and more after they got married and M.M. grew resentful and distant. The night in October 2021, after Munsey's father and A.L. left their apartment, M.M. went into the bedroom and asked Munsey to bring her a knife so she could "fix" one of her bras. A few minutes later he heard a "weird cough" and ran into the bedroom. M.M. pushed past him and ran out of the apartment, limping. He could not find her or reach her by phone, and when he noticed the knife had blood on it, he called 911.

### C. Evidence of M.M.'s Immigration Status

The People charged Munsey with one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1) (count 1)); three counts of corporal injury to a spouse, M.M. (Pen. Code, § 273.5, subd. (a) (counts 2, 4, 5); and one count of making a criminal threat to M.M. (Pen. Code, § 422 (count 3)). The People further alleged as to count 1 that Munsey personally used a deadly and dangerous weapon (Pen. Code, § 1192.7, subd. (c)(23)); as to counts 1 and 3, that M.M. was a victim of domestic violence (Fam. Code, § 6211; Pen. Code, § 1203.097, subd. (a)); as to counts 1 and 2, that Munsey personally inflicted great bodily injury upon M.M. (Pen. Code, § 12022.7, subd. (e)); and as to counts 2 and 3, that Munsey personally used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)).

The People filed a motion in limine to exclude any testimony regarding M.M.'s immigration status. The defense argued that such testimony was relevant to prove its theory that M.M. fabricated the abuse allegations in order to get out of her marriage without jeopardizing her visa status.

At a hearing under Evidence Code section 402 to determine the admissibility of evidence regarding M.M.'s immigration status, M.M. testified that she entered the U.S. in May 2021 on a K-1 or "fiancée" visa. The K-1 visa allowed her to enter and stay in the U.S. if she married Munsey within

5

90 days.  Soon after they married, M.M. applied for a green card.  When the October 2021 incident happened, M.M.'s green card application was still pending.  After the incident, M.M. applied for employment authorization and submitted visa paperwork with some assistance at a women's shelter.  She was unsure what the paperwork was for, however, and thought it had to do with obtaining a work permit.  M.M. told someone at the shelter about her "situation" with Munsey and what she had "endured" in the process of filling out the paperwork.  M.M. said she did not know whether she would be able to stay in the country if she was no longer married to Munsey.

The court found that while potentially relevant, the circumstances surrounding M.M.'s status under either a K-1 or U visa were confusing and would result in "a separate mini trial to educate the jury on exactly what different visa statuses are."  The court observed that the implications of various visas were confusing even to the court and counsel for the parties, and that allowing testimony about the visas would also be unduly consumptive of time.  The court noted there was "no indication from [M.M.] that she even knew" that making false domestic violence accusations would allow her to remain in the country.  The court therefore ruled at the end of the hearing that any reference to M.M.'s visa status was excluded under Evidence Code section 352, but the court left open the possibility that after hearing M.M.'s testimony, the court might give the defense an opportunity to cross-examine M.M. about her K-1 visa.

After M.M.'s direct examination, the court confirmed it would exclude testimony about M.M.'s visa status because its "probative value is outweighed by the amount of time that would be consumed in trying to insure [*sic*] the jury understood the complexities of visas, why they're obtained, how they're obtained, [and] when they're obtained.  Citing Evidence Code section

6

352, the court also found that presenting such evidence would require expert testimony that would "take a substantial period of time and would result in, more or less, a trial within a trial regarding [M.M.'s] immigration status." The court noted that there was very little evidence that M.M. "even came close" to obtaining a U visa, and that there had been "no showing of any relevance as to why [M.M.] obtaining a K1 visa is material to this case[.]"

*D. Verdict and Sentencing*

After several days of trial, the jury found Munsey guilty of each charged offense and found true all special alleged circumstances. The court sentenced Munsey to a total of eight years in prison. Munsey timely appealed.

DISCUSSION

Munsey argues on appeal that the trial court prejudicially erred by excluding testimony regarding M.M.'s K-1 visa under Evidence Code section 352. We disagree.

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb [a] trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266; Evid. Code, § 353.)

A party may impeach or discredit a witness during cross-examination by " 'revealing possible biases, prejudices, or ulterior motives of the witness.' [Citation.] 'The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." ' [Citation.] However, the right to cross-examine a witness . . . isn't absolute [and] '[a] trial court may restrict defense cross-examination of

7

an adverse witness on the grounds stated in Evidence Code section 352.' [Citations.]" (*Villa, supra*, 55 Cal.App.5th at p. 1051.)  Evidence Code section 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)  Trial courts have broad latitude under Evidence Code section 352 to exclude such impeachment evidence.  (*Villa*, at p. 1051.)

As a threshold matter, the trial court reasonably concluded that M.M.'s status as a K-1 visa holder upon entering the U.S. was of questionable relevance to her credibility.  M.M. testified at the pre-trial hearing that the K-1 visa allowed her to stay in the U.S. if she married Munsey within 90 days.  They got married within the 90-day period, after which M.M. applied for a green card.  Given that M.M. obtained a K-1 visa and met the 90-day marriage requirement *before* allegations of abuse surfaced, and that she applied for a green card shortly after they married, it is unclear how her K-1 visa status was relevant to any potential motive for fabricating the abuse. Munsey made no offer of proof as to the expert testimony he wished to present regarding the K-1 visa or how it would logically establish any motive for M.M. to make false allegations of abuse.  As the People note, Munsey makes no argument on appeal that the court should have admitted evidence regarding how the abuse allegations might impact M.M.'s pending green card application.  And even assuming that the excluded evidence would show M.M. could be deported if she did not stay married to Munsey unless she proved abuse, there is no evidence M.M. was *aware* of that possibility, further minimizing the probative value of such testimony.

8

The trial court also acted within the bounds of reason by concluding that any limited probative value of testimony about M.M.'s K-1 visa status was substantially outweighed by the significant probability of undue consumption of time. Defense counsel contended that such testimony would only consume 20 minutes, but it was neither arbitrary nor patently absurd for the court to reject that contention. In addition to expert testimony, M.M. likely would have been called back to repeat her testimony from the Evidence Code section 402 hearing for the jury. The parties' attorneys would also potentially have had to address any prior preliminary hearing testimony on the subject. (See *Villa, supra*, 55 Cal.App.5th at p. 1053 [trial court's concerns about admitting U visa evidence were "well founded" for similar reasons having to do with undue time consumption].) Furthermore, the parties may have decided to put on additional witnesses to testify about whether M.M. knew about the specific implications of the abuse allegations on her status. (See *ibid.*) Weighed against the questionable relevance of the evidence, the court was therefore justifiably concerned that admitting evidence of M.M.'s visa status would be unduly time-consuming.

Moreover, as the court noted, the nature, requirements, and limitations of the K-1 visa were confusing even to the parties' attorneys and the court. To properly evaluate whether the K-1 visa requirements gave M.M. a compelling enough reason to lie about the abuse, the parties would have had to educate the jurors about conditions for obtaining and maintaining a K-1 visa, the process of applying for a green card after marriage, the likelihood of obtaining a green card after entering on a K-1 visa, the effects M.M.'s change in marital status would have had on her immigration status, and the distinction between different types of visas. (See *Villa, supra*, 55 Cal.App.5th at p. 1053 [concluding that "the trial judge rightly recognized" introducing

9

evidence on the U visa program "would have created a substantial risk of distracting and confusing the jury"].) The trial court did not abuse its discretion in finding that the jury would be unduly distracted or confused by these collateral issues involving federal immigration law.

The court's decision in *Villa*, which addressed the admissibility of U visa evidence, supports our conclusion. In *Villa*, the defendant argued that the trial court erred by excluding evidence that the domestic abuse victim had applied for a U visa after testifying at the preliminary hearing. (*Villa, supra*, 55 Cal.App.5th at pp. 1044, 1048.) The victim in *Villa* learned about the U visa program at a shelter, went to the prosecutor's office to inquire about the process of obtaining a U visa, and understood that to qualify for the visa, she had to be considered a victim of domestic violence. (*Id.* at p. 1048.) The Court of Appeal concluded that although the evidence was relevant for impeachment, the trial court did not abuse its discretion because the minimal probative value of the evidence was "easily outweighed by the potential for wasted time and jury confusion." (*Id.* at pp. 1044–1045.)

Munsey argues that *Villa* is distinguishable because it involved a U visa and not a K-1 visa. But if anything, the facts surrounding M.M.'s K-1 visa present an even less compelling case for admitting visa status evidence than the circumstances in *Villa*. In *Villa*, the victim's ability to obtain a U visa was dependent on her status as a victim of domestic violence. (*Villa, supra*, 55 Cal.App.5th at p. 1048.) Here, M.M. entered the country on a K-1 visa, and there is no evidence how that visa was still tied—if at all—to her ability to stay in the country at the time she notified law enforcement about the abuse. Importantly, in *Villa*, the victim testified that she was at least *aware* of the connection between the abuse allegations and her U visa application (*ibid.*), whereas here, M.M. expressed no knowledge of how her

10

allegations might impact her status. Therefore, the reasoning in *Villa* applies with equal, if not greater, force to the facts in this case.

Our conclusion is also consistent with *Castaneda-Prado*. In that case, the defendant was convicted of sexually molesting two minor victims. (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1266.) Citing *Villa*, the trial court in *Castaneda-Prado* excluded one victim's preliminary hearing testimony that she filed a declaration accusing the defendant of sexual abuse to assist her mother in obtaining a U visa. (*Id*. at pp. 1271, 1275.) The court also declined to hold an Evidence Code section 402 hearing. (*Id*. at p. 1275.) It reasoned that while the U visa evidence was relevant, admitting it would risk confusing the jury, would cause undue prejudice, and would be unduly time consuming. (*Ibid*.) In *Castaneda-Prado*, there was no evidence that a U visa application had been submitted. (*Id*. at p. 1274.)

The Court of Appeal reversed the defendant's conviction, relying on the fact that the victim *admitted* she was motivated by potential U visa benefits when she first gave a sworn statement accusing the defendant of abuse. (*Castaneda-Prado, supra*, 94 Cal.App.5th at pp. 1286, 1288.) The court observed that because of that admission, there was less risk of undue consumption of time because no inquiry into U visa procedures was even necessary—"[w]hat mattered most was that [the victim] apparently believed she was furthering her mother's interest in obtaining a U visa by giving damaging testimony" about the defendant. (*Id*. at p. 1288.) The court also noted that the prosecution's case turned almost entirely on the victim's credibility given the lack of corroborating evidence, and that the victim's testimony had grown more detailed and more incriminating over time. (*Id*. at pp. 1287–1288.)

11

Here, unlike in *Castaneda-Prado*, there is no evidence that M.M. was motivated by K-1 visa benefits, real or otherwise. And as the Court of Appeal in *Castaneda-Prado* recognized, absent evidence that the victim *knew* about potential visa benefits, "there would have been an inevitable contest over whether, in [the victim's] mind, the [] visa process could possibly have influenced her testimony and to what extent." (*Castaneda-Prado, supra*, 94 Cal.App.5th at p. 1288.) Moreover, unlike in *Castaneda-Prado*, the case against Munsey included additional corroborating evidence in the form of a text message, photographs of M.M.'s injuries, 911 call recordings, and testimony from witnesses who observed M.M. before and after the October 2021 incident.

For these reasons, we conclude that the trial court did not exercise its discretion in an arbitrary, capricious, or patently absurd manner when it excluded testimony about M.M.'s K-1 visa.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:


IRION, Acting P. J.


DO, J.

12